No. 19-15607

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA PARENTS FOR THE EQUALIZATION OF EDUCATIONAL
MATERIALS; ARVIND RAGHAVAN, INDIVIDUALLY AND AS PARENT AND
NEXT FRIEND OF M.R. AND N.R.; VISHNUKUMAR THUMATI,
INDIVIDUALLY AND AS PARENT AND NEXT FRIEND OF P.T. AND N.T.;
SHAILESH SHILWANT, INDIVIDUALLY AND AS PARENT AND NEXT FRIEND
OF P.S. AND P.S.S.,

*Plaintiffs-Appellants*,

v.

TOM TORLAKSON, IN HIS OFFICIAL CAPACITY AS STATE
SUPERINTENDENT OF PUBLIC INSTRUCTION AND DIRECTOR OF
EDUCATION FOR THE CALIFORNIA DEPARTMENT OF EDUCATION;
(*CONTINUED ON NEXT PAGE*),

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 17-cv-00635-CRB
Hon. Charles R. Breyer

## APPELLANTS' OPENING BRIEF

Glenn Katon
KATON.LAW
385 Grand Ave., Ste 200
Oakland, CA 94610
(510) 463-3350
gkaton@katon.law

*Attorney for Appellants*

(*Defendants-Appellees Continued from Previous Page*)
Tom Adams, in his official capacity as Deputy Superintendent of the Instruction and Learning Support Branch of the California Department of Education; Stephanie Gregson, in her official capacity as Director of the Curriculum Frameworks and Instructional Resources Division of the California Department of Education; Michael Kirst, Ilene Straus, Sue Burr, Bruce Holaday, Feliza I. Ortiz-Licon, Patricia Ann Rucker, Nicolasa Sandoval, Ting L. Sun, and Trish Boyd Williams, each in their official capacity as a member of the California State Board of Education; Myong Leigh, in his official capacity as Interim Superintendent of the San Francisco Unified School District; Shamann Walton, Hydra Mendoza-Mcdonnell, Stevon Cook, Matt Haney, Emily M. Murase, Rachel Norton, and Mark Sanchez, each in their official capacity as a member of the San Francisco Unified School District Board of Education; Rick Schmitt, in his official capacity as Superintendent of the San Ramon Valley Unified School District; Mark Jewett, Ken Mintz, Rachel Hurd, Denise Jennison, and Greg Marvel, each in their official capacity as a member of the San Ramon Valley Unified School District Board of Education; Wendy Gudalewicz, in her official capacity as Superintendent of the Cupertino Union School District; Anjali Kausar, Liang Chao, Kristen Lyn, Soma Mccandless, and Phyllis Vogel, each in their official capacity as a member of the Cupertino Union School District Board of Education; Cheryl Jordan, in her official capacity as Superintendent of the Milpitas Unified School District; Daniel Bobay, Danny Lau, Chris Norwood, Hon Lien, and Robert Jung, each in their official capacity as a member of the Milpitas Unified School District Board of Education.

## CORPORATE DISCLOSURE STATEMENT

Appellant California Parents for the Equalization of Educational Materials is a nonprofit corporation that does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Date:  August 8, 2019

KATON.LAW

*/s/ Glenn Katon*
Glenn Katon

Attorney for Appellants
CALIFORNIA PARENTS FOR THE
EQUALIZATION OF EDUCATIONAL
MATERIALS; ARVIND RAGHAVAN,
individually and as parent and next friend of
M.R. and N.R.; VISHNUKUMAR
THUMATI, individually and as parent and
next friend of P.T. and N.T.; SHAILESH
SHILWANT, individually and as parent and
next friend of P.S. and P.S.S.

**STATEMENT ON ORAL ARGUMENT PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 34(a)(1)**

Appellants request oral argument to address the novel constitutional issues raised by this appeal, which are of great importance to California's statewide public-school curriculum.

Date: August 8, 2019

KATON.LAW

*/s/ Glenn Katon*
Glenn Katon

Attorney for Appellants
CALIFORNIA PARENTS FOR THE EQUALIZATION OF EDUCATIONAL MATERIALS; ARVIND RAGHAVAN, individually and as parent and next friend of M.R. and N.R.; VISHNUKUMAR THUMATI, individually and as parent and next friend of P.T. and N.T.; SHAILESH SHILWANT, individually and as parent and next friend of P.S. and P.S.S.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT............................................................i

STATEMENT ON ORAL ARGUMENT................................................................ ii

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION................................................................................................1

JURISDICTIONAL STATEMENT......................................................................3

ISSUES PRESENTED.........................................................................................3

STATEMENT OF THE CASE .............................................................................4

SUMMARY OF THE ARGUMENT...................................................................16

ARGUMENT ....................................................................................................17

## I.   PARENTS STATED CLAIMS FOR RELIEF UNDER THE EQUAL PROTECTION CLAUSE, FREE EXERCISE CLAUSE, ESTABLISHMENT CLAUSE, AND SUBSTANTIVE DUE PROCESS CLAUSE

A.   Standard Of Review……………………………………………..17

B.   Pleading Standard………………………………………………18

C.   Parents Adequately Pled a Claim Under the Equal Protection Clause…………………………………………………………...18

D.   Parents Adequately Pled a Claim Under the Free Exercise Clause…………………………………………………………...31

E.   Parents Adequately Pled a Claim of Unconsitutional Endorsement of the Abrahamic Faiths under the Established Clause…………………………………………………………...35

F.     Parents Adequately Pled a Claim Under the Substantive Due Process Clause……………………………………...................41

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING PARENTS' MOTION TO AMEND COMPLAINT

A.     Standard of Review…………………………………………...45

B.     District Court's Denial of Motion to Amend Complaint……..45

C.     Amendment Based Upon New Facts and Law Would Not Be Futile………………………………………………………….46

D.     Amendment Would Not Prejudice State Officials……………50

## III.    SUMMARY JUDGMENT IN FAVOR OF STATE OFFICIALS SHOULD BE REVERSED

A.     Standard of Review…………………………………………...51

B.     Summary Judgment Standard………………………………...51

C.     Summary Judgment in Favor of State Officials Should Be Reversed Because Genuine Issues of Material Fact Preclude Judgment as a Matter of Law………………………………52

D.     Exclusion of Expert Report Was Abuse of Discretion……….60

CONCLUSION ...............................................................................61

STATEMENT OF RELATED CASES…………………………………...63

CERTIFICATE OF COMPLIANCE…………………………………...64

CERTIFICATE OF SERVICE……………………………………………65

**Cases**

*Buchanan v. Warley*,
    245 U.S. 60 (1917)..........................................................44, 45

*Cantwell v. Conn.*,
    310 U.S. 296 (1940)………………………………………………37

*Lee v. Weisman*,
    505 U.S. 577 (1992).........................................................................32

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993)………………………………………………31

*Doe v. Nestle U.S., Inc.*,
    766 F.3d 1013 (9th Cir. 2014)………………………………………49

*Doe v. Porter*,
    188 F. Supp. 2d 904, (E.D. Tenn. 2002), *aff'd*, 370 F.3d 558 (6th Cir.
    2004)………………………………………………………………...39

*Edgerly v. City & Cty. of S.F.*,
    599 F.3d 946 (9th Cir. 2010)……………………………………...51

*Edwards v. Aguillard*,
    482 U.S. 578 (1987)………………………………………………38

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003)…………………………………...45, 50

*Family Ass'n, Inc. v. City and County of San Francisco*,
    277 F.3d 1114 (9th Cir. 2002)………………………31, 37, 38, 39, 52

*Fields v. Palmdale School Dist.*,
    427 F.3d 1197 (9th Cir. 2005),
    *as amended*, 447 F.3d 1187 (2006)…………………………42, 43, 44

*Genentech, Inc. v. Abbott Laboratories*,
    127 F.R.D. 529 (N.D. Cal. 1989)…………………………………50

*Gordon v. City of Oakland*,
    627 F.3d 1092 (9th Cir. 2010)……………………………………45

*Johnson v. Riverside Healthcare System, LP*,
    534 F.3d 1116 (9th Cir. 2008)……………………………………18

*Lawrence v. Texas*,
    539 U.S. 558 (2003)………………………………………………45

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008)……………………………………...46

*Lemon v. Kurtzman*,

403 U.S. 602 (1971)………………………………………38, 52, 61

*Levitt v. Yelp! Inc.*,
765 F.3d 1123 (9th Cir.2014)………………………………………..18

*Loving v. Va.*,
388 U.S. 1 (1967) ………………………………………………..44

*Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission*,
138 S. Ct. 1719 (2018)………………………………..33, 45, 49, 50

*McCreary County v. ACLU*,
545 U.S. 844 (2005)……………………………………………..37, 61

*McNeil v. Sherwood Sch. Dist. 88J*
918 F.3d 700(9th Cir. 2019)……………………………………..44

*Meyer v. Neb.*,
262 U.S. 390 (1923)……………………………………………..42, 43

*Monteiro v. Tempe Union High School District*,
158 F.3d 1022 (1998)…………………………………………..18

*Pierce v. Society of the Sisters*,
268 U.S. 510 (1925)……………………………………42, 43, 44

*Primiano v. Cook*,
598 F.3d 558 (9th Cir.2010)………………………………………51

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000)……………………………………………39

*Shwarz v. United States*,
234 F.3d 428 (9th Cir. 2000)……………………………………...39

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)……………………………………18

*Stone v. Graham*,
449 U.S. 39 (1980)……………………………………………..38

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
137 S. Ct. 2012, (2017)……………………………...32,33,45,49,50

*Troxel v. Granville*,
530 U.S. 57 (2000)……………………………………………..42

*Trunk v. City of San Diego*,
629 F.3d 1099 (9th Cir. 2011)……………………………………39

*U.S. v. Thind*,
261 U.S. 204 (1923)……………………………………………..8

*Vernon v. City of Los Angeles*,
27 F.3d 1385 (9th Cir. 1994)………………………………...38, 39, 52

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943)……………………………………………42

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)……………………………………………………42
*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)…………………………………………...30

## Statutes and Regulation

Ed. Code § 51501……………………………………………………..22
Ed. Code § 60119………………………………………………4, 8, 23
Ed. Code § 60200……………………………………………….22, 23
Ed. Code § 99200………………………………………....…………11
28 U.S.C § 1291……….……..……………………………..………….3
28 U.S.C. § 1331………………………………………………………2
28 U.S.C. § 1343………………………………………………………3
42 U.S.C. § 1983………………………………………………………2
5 C.C.R. § 9511…..…………………………………………………...12

## Rules

FRCP 12(b)(6)………………………………………………...15, 18, 46
FRCP 15(a)……………………………………………………………45

## Other Authorities

Elliot M. Davis, *Unjustly Usurping the Parental Right:* Fields v.
    Palmdale School District, *427 F.3d 1197 (9th Cir. 2005)*, 29 Harv.
    J.L. & Pub. Pol'y 1133 (2006)………………………………………44

Jonathan M Kenoyer, *Ancient Cities of the Indus Valley Civilization*
    (American Institute of Pakistan Studies 1998)………………………8

Jonathan Mark Kenoyer, "Cultures and Societies of the Indus Tradition,"
    *Historical Roots in the Making of 'the Aryan,'National Book Trust*,
    New Delhi (2006)…………………………………………………..8

Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747
    (2011)……………………………………………………………44, 45

Thomas R Trautmann, *Aryans and British India* (Berkeley University of
    California Press 1997); "Does India Have History? Does History Have

India?," *Comparative Studies in Society and History* 54, no. 1 (2012)…………………………………………………..…8, 10

**INTRODUCTION**

The History-Social Science Content Standards for California Public Schools, adopted in 1998 and upon which all history and social science curricula is based, provides the origins, beliefs, and virtues of world religions from the perspective of followers of those faiths. This is true for all religions except Hinduism. The Standards use ahistorical, derisive language only for the Hindu faith, *with no indication of what Hindus believe*. Thus, according to the Standards, the beliefs and practices of "Brahmanism," an iteration of the caste system, "evolved into" Hinduism, and students should learn the debunked and racist Aryan invasion theory as the roots of Hinduism. The Standards also refer to the *Bhagavad Gita*, which is sacred scripture for Hindus, as "literature" that is part of an "intellectual tradition." For other faiths, the Standards explain adherents' belief in their scripture, their divinity, values they contributed to humanity, and their basic narratives. The Standards describe only Hinduism in secular and hostile terms.

The History-Social Science Framework is similarly derisive to Hinduism, which is no surprise, since state law requires that the Framework be aligned with the Standards. The Framework portrays the origin of Hinduism as "priestly families[] *assum[ing] authority over complex devotional rituals*," while using generous language that would be used by a believer to describe other faiths. Incredibly, the Framework violates state law by instructing: "Teachers should

make clear to students that [caste] was a social and cultural structure as well as a religious belief." Several statutes require that educational material shall not "reflect adversely" on a religion, a requirement the Framework follows for all faiths except Hinduism. Notably, an earlier draft of the Framework made the opposite claim when it stated that caste was not a religious belief and the change to caste being a religious belief was suggested by a group of professors secretly convened and coordinated by Appellee Tom Adams and then deceptively portrayed as "public comment" on the Framework. For no religion besides Hinduism did a State Official secretly convene a group to review and provide falsely characterized proposed changes to the Framework.

Appellants are a nonprofit organization that is mostly parents of California schoolchildren and three parents on behalf of themselves and their children enrolled in California public schools (collectively, "Parents"). They seek an injunction against members of the State Board of Education to remediate the derogatory treatment of Hinduism in the Standards and Framework. The District Court dismissed three of Parents' four constitutional claims, denied their motion to amend their Complaint, and granted summary judgment against their fourth claim. This Court should reverse the trial court's dismissal, order denying motion to amend, and summary judgment.

# JURISDICTIONAL STATEMENT

Jurisdiction in the District Court was based upon 28 U.S.C. § 1331 because the Complaint alleges violations of the United States Constitution and 42 U.S.C. § 1983, and therefore raises questions of federal law, and upon 28 U.S.C. § 1343 because Appellants seek relief for the deprivation of constitutional rights under color of state law. The Court of Appeals has jurisdiction of this appeal from the final decision of the District Court under 28 U.S. Code § 1291. The District Court entered final judgment against Appellants on February 28, 2019 (ER0057) and Appellants filed a Notice of Appeal on March 29, 2019 (ER0001).

# ISSUES PRESENTED

I.   Whether Parents adequately plead claims for relief under the Equal Protection Clause, Free Exercise Clause, Establishment Clause, and Substantive Due Process Clause.

II.  Whether the District Court abused its discretion by denying Parents' motion to amend complaint.

III. Whether summary judgment in favor of State Officials should be reversed.

## STATEMENT OF THE CASE

### A. The Standards Are the Foundation for California Public School Education

The California State Board of Education ("State Board") adopted the *History–Social Science Content Standards for California Public Schools, Kindergarten through Grade Twelve* in October 1998 (the "Standards"). ER1443-1510. To be eligible to receive state funds[1], each school board district must determine that each pupil in each school has sufficient textbooks or instructional materials, or both, that are aligned to the Standards. Ed. Code § 60119(a). In addition, all instructional materials must be "aligned to the content standards adopted by the state board." *Id*. § 60200(c)(4).

#### 1. *The Standards' coverage of religion*

Of the many topics the Standards include, 25 percent of the material for the sixth grade and 41 percent of the seventh grade address religion. ER1380-89 (Standards color coded). The Standards cover several major world religions: Hinduism, Judaism, Buddhism and Christianity in the sixth grade and Islam in

---

[1] "The governing board of a school district that receives funds for instructional materials from any state source is subject to the requirements of this section." Ed. Code § 60119(d); *see also id*. § 60119(a)(2)(B).

seventh grade.[2] ER1443-1510. Generally, the Standards require an understanding of the basic tenets of these religions, such as their origins, beliefs, and virtues. Judaism, the Standards explain, is "the first monotheistic religion based on the concept of one God who sets down moral laws for humanity," with "ethical teachings" that include "belief in God, observance of law, practice of the concepts of righteousness and justice, and importance of study." ER1473. The Standards also include the "significance of Abraham, Moses, Naomi, Ruth, David, and Yohanan ben Zaccai in the development of the Jewish religion." *Id*. For Buddhism, the Standards require students to "[k]now the life and moral teachings of Buddha." ER1474. Students must also learn about the political and moral achievements of Asoka, a Buddhist emperor. *Id*.

The Standards require the teaching of Christians' belief in the divine origins of their faith and the narratives of Christianity's central figures: "Note the origins of Christianity in the Jewish Messianic prophecies, the life and teachings of Jesus of Nazareth as described in the New Testament, and the contribution of St. Paul the Apostle to the definition and spread of Christian beliefs (e.g., belief in the Trinity, resurrection, salvation)." ER1475. For Islam, the Standards portray a faith that originates in scripture: "Explain the significance of the *Qur'an* and the Sunnah as

_____

[2] The Standards also cover the contributions of Judaism and Christianity in the seventh grade. ER1388-89.

the primary sources of Islamic beliefs, practice, and law." ER1477.

For Hinduism, the Standards require: "Explain the *major beliefs and practices of Brahmanism* in India and how they *evolved into early Hinduism*." ER1474 (emphasis added). The Standard that immediately precedes the first mention of Hinduism instructs: "Discuss the significance of the Aryan invasions." *Id*. The Standard that follows the first mention of Hinduism provides: "Outline the social structure of the caste system." *Id*. The Standards' reference to the *Bhagavad Gita* describes it not as sacred scripture of Hindus, but as "literature" that is part of "important aesthetic and intellectual traditions" of India. *Id*. The Standards make no mention of Hindus' belief in the divinity of their faith, the scripture upon which it is based, the values taught by the religion, or the figures central to the faith.

### 2. *Standards function in the classroom*

Professor Brad Fogo has noted that you can "[o]pen any textbook in the state and you are likely to see one of standards in a sidebar to indicate alignment." ER0146. The Standards that correspond to the subject matter in a textbook published recently by National Geographic and adopted by the State Board can be seen at the bottom of page 149. ER1202. The alignment to the Standards' tenet that "beliefs and practices of Brahmanism . . . evolved into Hinduism" is reflected in the textbook's framing that "priests known as Brahmins performed rituals . . . . Their religion came to be called Brahmanism, or early Hinduism. In time

Brahamanism's rituals and hymns were recorded in sacred texts called the Vedas."
ER1201. The textbook goes on to say that the "religion that *grew out of the diverse
ideas and practices* of Vedic culture is known as Hinduism." ER1203 (emphasis
added). Further, the 2016-17 instructional materials used by a sixth-grade student
in Contra Costa County provide a "Learning Target" that "I can explain the major
beliefs and practices of Brahamanism in India and how it evolved into early
Hinduism," and "Hinduism Learning Objectives" which lists Aryans, Caste System
and Brahmanism as three of the four learning objectives. ER0616 (major beliefs);
ER0620 (Learning Objectives).

    The State Board also adopted[3] *Discovery Education, Discovery Education
Social Science Techbook, Grades Six through Eight*, which includes an elaborate
exercise to role play the caste system. ER1025-27. This book further requires as a
"Lesson Objective" that "By the end of this lesson, students should be able to:
*Connect the beliefs of Hinduism to the caste system* and other elements of ancient
Indian life," and repeats the Standards on Aryan invasions, Brahmanism and caste.
ER1042 (quote with emphasis added); ER1034 (Standards); ER1046 (same).

    3. *The Aryan invasions as the roots of Hinduism*

    Standard 6.5.2, which precedes the instruction to explain the beliefs and

---

[3] The Summary of State Board of Education Action showing that State Officials
adopted the textbook can be found at ER1182.

practices that developed into Hinduism, provides: "Discuss the significance of the Aryan invasions." ER1474. The theory that Aryans invaded Ancient India "is a long-ago debunked, Orientalist theory, derived from 19th-century pseudoscience and designed to support European colonial projects in Asia." ER0099[4]; *cf. U.S. v. Thind*, 261 U.S. 204, 210 (1923) ("The Aryan theory, as a racial basis, seems to be discredited by most, if not all, modern writers on the subject of ethnology."). The discredited Aryan invasion theory in the Standards is perpetuated through, among other things, adoption of current textbooks that feature the theory. *See* ER1204 (National Geographic textbook). The Discovery techbook the State Board adopted in November 2017 actually provides: "The Aryans invaded India from the northwest around 1500 BCE. They conquered the land and introduced new social and religious customs. Over time, their religion mixed with local beliefs to create Hinduism." ER1035.

---

[4] Professor Joshi supports her description with extensive citation to scholarly works authored by members of State Officials' South Asia Faculty Group: Thomas R Trautmann, *Aryans and British India* (University of California Press 1997); "Does India Have History? Does History Have India?," *Comparative Studies in Society and History* 54, no. 1 (2012). Jonathan Kenoyer, in his 1998 book, states "Many scholars have tried to correct this absurd theory…." Jonathan M Kenoyer, *Ancient Cities of the Indus Valley Civilization* (American Institute of Pakistan Studies 1998) at 174. In a 2006 article he mentions the scholarly consensus that the Aryan invasion and migration theories are no longer considered to be true. Jonathan Mark Kenoyer, "Cultures and Societies of the Indus Tradition," *Historical Roots in the Making of 'the Aryan,'National Book Trust*, New Delhi (2006).

**B. The Role of the History-Social Science Framework**

As with the Standards, to receive state funds, school district instructional materials must be "consistent with the content and cycles of the curriculum framework adopted by the state board." Ed. Code. § 60119(a)(1)(A). The History-Social Science Framework (Framework), adopted by the State Board in July 2016, covers Hinduism, Judaism, Buddhism and Jainism in sixth grade; Christianity, Islam, Sikhism and modern movements in Hinduism in seventh grade; contributions of Sikhs in fourth grade; and, in tenth grade, the purported benefit to Hindus of Christian colonization in India. ER1512-2366.

*1. The Framework's treatment of Hinduism*

The Framework, like the Standards, presents the believer's perspective of the central tenets for every religion other than Hinduism.[5] It describes Judaism as making "an enduring contribution of morality and ethics to Western civilization" and provides that "[t]he Exodus from Egypt was an event of great significance to Jewish law and belief, especially the concept of a special relationship or covenant between the Israelites and God." ER1679.

For Christianity, the Framework provides: "Through selections from Biblical literature, students will learn about those teachings of Jesus that advocate

_____

[5] Color-coded Framework also identifies the relevant sections that describe various religions in sixth and seventh grades. ER1273-1375.

9

compassion, justice, and love for others. He taught that God loved all his creation, regardless of status or circumstance, and that humans should reflect that love in relations with one another. Jesus shared the Jewish belief in one God, but he added the promise of eternal salvation to those who believe in him as their savior." ER1713. The Framework explains about Islam: "According to Muslim tradition, Muhammad, an Arabic-speaking merchant, received revelations from God, which were written down in the Qur'an. This message declared that human beings must worship and live by the teachings of the one God and treat one another with equality and justice." ER1720. For Buddhism, the Framework describes, "suffering, compassion and mindfulness" are the "fundamental ideas" of the religion. ER1690. "Jainism promoted the idea of ahimsa (nonviolence to all life)," and "[t]he three basic principles of Sikhism are honest living, sharing with the needy, and praying to one God." *Id*. (Jainism) and ER1757 (Sikhism).

The origin of Hinduism, according to the Framework, is the Aryan Invasion Theory[6]. ER1686-87. The Framework provides that later in the Vedic period, "*Vedic culture emerged as a belief system* that combined the beliefs of Indic speakers with those of older populations." ER1687 (emphasis added). "Vedic"

---

[6] The Framework does not use the term "Aryan invasion" as in the Standards, a tacit acknowledgment of how problematic it is. The Framework uses instead "Indo-European," a synonym. ER014-15. *See also* Thomas R. Trautmann, *Aryans and British India* (1997) at 13 (ER1101).

refs to the Vedas, which are sacred scripture according to Hindus. *See* Joshi Report at 12-13. The Framework further portrays the origins of Hinduism as "priestly families[] *assumed authority over complex devotional rituals*," and ancient Hindu sages "*expounded the idea* of the oneness of all living things and of Brahman as the divine principle of being." ER1687 (emphasis added). The Framework also instructs: "Teachers should make clear to students that [caste] was a social and cultural structure as well as a religious belief." ER1689.

2. *Appellee Adams' recruitment of the "South Asia Faculty Group" to provide reports falsely billed as "public comment"*

During the Framework adoption process, Appellee Adams recruited professors to review and provide feedback on the depiction of Hinduism in the Framework. ER0215-17. He and Nancy McTygue, who was Executive Director of the California History-Social Science Project[7] (CHSSP) and was also an IQC Commissioner until December 2015, presented the feedback to the public without acknowledging that Adams handpicked the professors, known as the South Asia Faculty Group (the Group) to obtain the viewpoint he sought. ER0303. Adams made this secret arrangement after making various claims about the use of experts. ER1013-14; ER1051. He claimed during the February 2015 IQC meeting that

_____

[7] "The primary writer for the framework was the California History–Social Science Project." ER1522; The California History-Social Science Project is also authorized by statute to develop and enhance teachers' subject matter and content knowledge, among other things. Ed. Code §§ 99200-01.

experts would be hired using a contracting process, which vice-chair Bill Honig explained would be an open process. ER1013-14; *see* 5 C.C.R. § 9511 (regulatory process for the use of Content Review Experts to make recommendations to the IQC and the SBE). Adams later claimed that "experts will be used by the IQC and SBE will have to apply via an application and appointed by the SBE. The decision of whether experts are needed will be decided after the October 8-9 meeting." ER1051. Finally, Honig announced during the October 2015 IQC meeting that no applications would be sought for an expert panel to review the Framework. ER0075. No evidence in the record indicates that State Officials solicited outside professors to issue reports on the Framework's depiction of any other religion besides Hinduism.

By October 2015, Adams had asked Professors Kamala Visweswaran and Lawrence Cohen to submit a report on the Framework outside of the expert appointment process contemplated by California regulation[8]. ER0315-17. According to Visweswaran, "Lawrence [Cohen] and I spoke with Tom Adams on Friday. **We are asked to submit a short, concise report by November 6, 2015** in time for the November 19th CDE meeting; we may also be asked to weigh in after

---

[8] The expert appointment process of 5 C.C.R. § 9511 is not required; however, it provides for an open selection process with accountability to the public. State Officials, who first indicated they would use that process, chose not to do so.

the 60 day period of comment on the curriculum framework, in Jan/Feb 2016." *See* ER0315-17 (original emphasis); *see also* Aug. 16, 2018 Ord. (Dkt 171) ("The California Department of Education requested the Faculty Group to review the Framework and provide a report of recommendations."). Neither Adams nor any other State Official disclosed to the public that Adams was coordinating the Group's work. ER0315-22 (absence of evidence).

Although Adams' recruitment of the handpicked Group was never made public, McTygue, who led the drafting of the Framework[9], did state publicly for the first time at the final History-Social Science Subcommittee meeting in March 24, 2016 that the subcommittee had been receiving reports from the Group. ER1014. The deadline for public comment for the March 24 meeting was February 29, 2016. ER1016. She, nevertheless, announced at the March 24 meeting: "I can read from a letter I just got this morning" from the Group and proceeded to use that letter in making edits to the Framework draft under consideration. ER1016. Further, McTygue recommended numerous edits to the Framework draft even though she did not understand them. She did so based upon the Group's recommendations. ER1015-16. When asked about the suggestions by members of

---

[9] "The primary writer for the framework was the California History–Social Science Project (CHSSP), led by Nancy McTygue, Executive Director, and Beth Slutsky, Academic Coordinator." ER1522.

the IQC, McTygue's responses included:

> "I don't pretend to have the capacity to answer that – in the level of detail, but I do defer to their expertise on this,"

> "I would argue that, um, we would defer to scholars on this topic – we don't have the capacity to answer that level of specificity on this question,"

> "I can't answer that specific question for you – I wish that I could tell you that have that level of knowledge but I don't personally have that."

*Id*. There is no indication that McTygue made recommendations to the IQC she did not understand from any source other than the Group Adams had enlisted.

McTygue also announced during the meeting that the subcommittee had been "persuaded by [Group's] letter to re-associate caste with [Hindu] religion." *Id*. Further, IQC Commissioner Marlene Galvan admitted during this meeting that the IQC was "relying on the experts, South Asia Faculty, to help us and that is why we conferred with them." ER1016.

Among the professors recruited to provide reports to the SBE as part of the Group were Sudipta Sen and Robert Goldman. ER0285. Sen and Goldman were also associated with the CHSSP and contributed material in that official capacity as authors of the Framework. ER1522-23. Their dual roles in writing the Framework and providing reports on its drafts through the Group recruited by Adams was not revealed until the December 2017 version of the Framework was published, which, for the first time, included "Acknowledgments." *Id*. Sen also purported to provide

14

public comment at a History-Social Science Subject Matter Committee Meeting. ER0304.

## C. Procedural History

Parents filed their Complaint on February 8, 2017, seeking declaratory and injunctive relief against State officials with the California Department of Education, members of the State Board of Education, and members of local school district boards and superintendents. ER2653-88. The Complaint asserts claims under the Equal Protection Clause of the Fourteenth Amendment, Establishment Clause of the First Amendment, Free Exercise Clause of the First Amendment, and Due Process Clause of the Fourteenth Amendment. *Id*. Parents stipulated with all local school district officials before they filed a responsive pleading that they need not participate in the litigation provided they agree to be bound by and comply with the final decision in the case. Dkts 91, 97, 99. State Officials moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). ER2704. The District Court granted the motion as to Parents' claims under the Equal Protection, Free Exercise, and Due Process Clauses. ER0036-57. The court also granted the motion as to Parents' Establishment Clause claim that the Standards and Framework impermissibly endorse the Abrahamic faiths and denied the motion as it applied to their claim that the Standards and Framework are impermissibly derogatory toward Hinduism. *Id*.

State Officials moved for summary judgment on the remaining claim and soon thereafter, Parents moved to defer consideration of that motion and moved to amend their complaint to add facts obtained during discovery and address two Supreme Court cases decided based upon the Free Exercise Clause. ER2715 (State Mot. Summ. J.); ER2717 (Parents' Mot. to Defer); ER2771-79 (Mot. to Amend). The parties also submitted a joint discovery letter on Parents' motion to compel, based upon State Officials' refusal to produce and documents not already available to the public. ER1161. The District Court granted the motion to defer, denied the motion to amend complaint, and denied Parents' motion to compel. ER1105. Parents then responded to State Officials motion for summary judgment and cross-moved for summary judgment. ER2723. The court granted State Officials' motion and denied Parents' cross-motion. ER0003-36.

## SUMMARY OF THE ARGUMENT

First, this Court should reverse the District Court's dismissal of Parents' claims that the California State Board of Education's Standards and Framework, upon which all public school instructional materials are based, violate the Equal Protection Clause of the Fourteenth Amendment by discriminating against Hinduism, the Free Exercise Clause of the First Amendment by lacking neutrality and evincing hostility toward Hinduism, the Establishment Clause of the First Amendment by endorsing the Abrahamic faiths, and the Substantive Due Process

Clause of the Fourteenth Amendment by interfering with Parents' care, custody, and control of their children.

Second, this Court should reverse the District Court's order denying Parents' Motion to Amend their Complaint because the proposed Amended Complaint included an abundance of new facts, addressed changes in the law and was not, as the District Court found, futile.

Third, this Court should reverse the District Court's summary judgment in favor of State Officials on Parents' Establishment Clause claim that the Standards and Framework are derogatory toward Hinduism because the court ignored a significant amount of evidence adduced by parents showing derogatory treatment of Hinduism and, further, the court drew inferences of fact against the nonmovant Parents.

## ARGUMENT

I.  **PARENTS STATED CLAIMS FOR RELIEF UNDER THE EQUAL PROTECTION CLAUSE, FREE EXERCISE CLAUSE, ESTABLISHMENT CLAUSE, AND SUBSTANTIVE DUE PROCESS CLAUSE**

### A. Standard of Review

This Court reviews de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).

### B. Pleading Standard

In reviewing the District Court's decision to dismiss under Rule 12(b)(6), this Court views Appellants' Complaint in the light most favorable to them, accepting all well-pleaded factual allegations as true, as well as any reasonable inferences drawn from them. *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008). Appellants' factual allegations must suggest that their claim has at least a plausible chance of success. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir.2014). "Indeed, it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 515 (2002).

### C. Parents Adequately Pled a Claim Under the Equal Protection Clause

Parents' Complaint provides detailed factual allegations that the Standards and Framework discriminate against Hinduism in violation of the Equal Protection Clause of the Fourteenth Amendment. The District Court concluded erroneously that this Court's decision in *Monteiro v. Tempe Union High School District*, 158 F.3d 1022 (1998) "squarely forecloses" Parents' equal protection claim based on the curriculum's content. For the separate assertion that the Framework adoption process disfavored Hindus, the court determined, again erroneously, that "allegations that the [State Board] gave "exalted" and secret expert treatment to the

SAFG are conclusory and implausible." ER0052 (squarely forecloses); ER0056 (implausible).

The Complaint quotes extensively from the Standards and Framework to support Parents' claim that they discriminate against Hinduism when compared with the treatment of other religions. ER2659-62 ¶¶ 32-42 (Standards); ¶¶ 95-111 (Framework). In sum, the Standards describe Hinduism as having "beliefs and practices" with no acknowledgment that Hindus believe their faith is rooted in the divine. ER2660-61 ¶ 37. The only reference in the Standards to Hindu scripture (the Bhagavad Gita) characterizes it simply as "literature" that is part of "important aesthetic and intellectual traditions" of India. *Id*. Such language ascribes worldly origins to Hinduism, whereas the Standards teach the belief in the divine origins of other religions. *Id*.; *see, supra,* 19-20.

Judaism, the Standards explain, is "the first monotheistic religion based on the concept of one God who sets down moral laws for humanity," with "ethical teachings." ER2660 ¶ 35. In addition, the Standards require the teaching of Christians' belief in the divine origins of their faith and the narratives of Christianity's central figures: "Note the origins of Christianity in the Jewish Messianic prophecies, the life and teachings of Jesus of Nazareth as described in the New Testament, and the contribution of St. Paul the Apostle to the definition and spread of Christian beliefs (e.g., belief in the Trinity, resurrection, salvation)."

*Id*. For Buddhism, students are required to learn about the "life and moral teachings of the Buddha," and for Islam, the Standards provide: "Explain the significance of the Qur'an and the Sunnah as the primary sources of Islamic beliefs, practice, and law." *Id*. ¶ 34 (Buddhism); ¶ 36 (Islam).

Similar to the Standards, the Framework refers to the origins of Hinduism as a "culture [that] emerged as a belief system," conspicuously omitting reference to Hindus' belief in the divine origins of their faith. ER2675 ¶ 95. The Framework does not explain other religions in sociological and anthropological terms; rather, it explains them as they are understood by followers of those faiths. *Id*. For Islam, the Framework emphasizes Muslims' belief that the prophet Muhammad received the word of God: "According to Muslim tradition, Muhammad, an Arabic-speaking merchant, received revelations from God, which were written down in the *Qur'an*. This message declared that human beings must worship and live by the teachings of the one God and treat one another with equality and justice." ER2676 ¶ 98.

Particularly disturbing, the Framework describes caste as a Hindu religious belief: "Today many Hindus, in India and in the United States, do not identify themselves as belonging to a caste. Teachers should make clear to students that this was a social and cultural structure as well as a *religious belief* (emphasis added)." *Id*. ¶ 99. Many would argue that caste was not and is not a Hindu religious belief. ER2671 ¶ 82. More importantly, apart from the accuracy of the State Officials'

interpretation of Hindu beliefs, it singles out Hinduism for negative treatment. The State Board does not ascribe negative religious beliefs to any other faith. This discrepancy that alone violates the Equal Protection Clause is exacerbated by the State Officials' violation of state policy and statutes governing the curriculum's treatment of religion only for Hinduism.

The Complaint specifies the state law and policy the Standards and Framework violate when it comes to Hinduism. One policy provides that: "Materials on religious subject matter remain neutral; do not advocate one religion over another; do not include simulation or role playing of religious ceremonies or beliefs; do not include derogatory language about a religion or use examples from sacred texts or other religious literature that are derogatory, accusatory, or instill prejudice against other religions or those who believe in other religions." ER n.8. This policy also incorporates several sections of the California Education Code, including:

> The state board and any governing board shall not adopt any textbooks or other instructional materials for use in the public schools that contain any matter reflecting adversely upon persons on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220.

Educ. Code § 51501. Thus, when the Standards and Framework ascribe secular origins to Hinduism, but not other religions, and instruct that caste is a Hindu religious belief without requiring that beliefs of other religions that would be

considered loathsome, State Officials violate law and policy requiring neutrality and prohibiting the inclusion of matter that reflects adversely upon persons on the basis of religion – and they do so only for Hinduism. Parents also pled that the goal listed in the *Curriculum Framework and Evaluation Criteria Committee Guidelines for the History-Social Science Framework for California Public Schools, Kindergarten through Grade Twelve* was applied to every religious culture except Hinduism. ER2671 ¶ 82, ER2674 ¶ 91.

Notwithstanding the abundance of detailed allegations explaining the ways in which the content of the Standards and Framework discriminate against Hinduism, the District Court held that Parents' "Equal Protection claim based on the curriculum's content is "squarely foreclose[d]" by *Monteiro*." ER0052. That ruling misapplies *Monteiro* for several reasons, including this Court's own language in that opinion.

In *Monteiro*, the parent of an African-American student challenged a school district's use of two required literary works that contain "repeated use of the profane, insulting and racially derogatory term 'nigger.'" 158 F.3d at 1024 (referring to *Huckleberry Finn* and *A Rose for Emily*). The Court balanced the First Amendment interests of high school students to receive information or ideas and the rights of those same students to receive a public education that neither fosters nor acquiesces in a racially hostile environment. *Id*. In denying the parent's

challenge, the first basis of the Court's rationale distinguishes that case emphatically from this one: "[T]he fact that a student is required to read a book does not mean that he is being asked to agree with what is in it." *Id*. at 1031. The Court made clear that its holding applies to the selection of literature, not school policies:

> Nor do we preclude the prosecution of actions alleging that schools have pursued *policies* that serve to promote racist attitudes among their students . . . . We conclude only that allegations that a school required that a book be read, and then refused to remove it from the curriculum, fails to provide the basis for a claim of discrimination under the Equal Protection Clause.

*Id*. at 1032 (emphasis added).

The Standards and Framework, developed and adopted by the State Board of Education, are the policies upon which classroom instructional materials must be based. Ed. Code § 60200(c)(4) (all instructional materials must be "aligned to the content standards adopted by the state board"); *Id*. § 60119(a)(1)(A) (to receive State funds, school district instructional materials must be "consistent with the content and cycles of the curriculum framework adopted by the state board"). As policies, the Standards and Framework do not fall within the *Monteiro* court's First Amendment balancing analysis. Indeed, such policies are squarely outside the scope of the *Monteiro* decision's holding as the Court itself described it, above. Logic dictates the same result: while reading a racial slur in literature may serve the educational purposes identified in the *Monteiro* opinion, using that same slur in

a State policy could easily be an equal protection violation itself. *See id*. at 1031-32 (describing educational purposes).

Accordingly, Parents have more than adequately pled a claim that the content of the Standards and Framework violates the Equal Protection Clause and the *Monteiro* decision does not foreclose that claim as the District Court mistakenly concluded.

In addition to challenging the content of the Standards and Framework, Parents' Complaint challenges the process by which the State Board of Education adopted the Framework as discriminatory against Hindus. ER2378-85 ¶¶ 47-92. Parents' equal protection claim in connection with the Framework adoption process has three components: (1) the history of anti-Hindu bias of Tom Adams, then Executive Director of the Instructional Quality Commission, of which the other members of the Commission knew or should have known, and of Professor Jonathan Kenoyer, who was the principal contributor of the so-called South Asia Faculty Group ("Group"),[10] (2) the Commission's secret consultations with the Group notwithstanding its misrepresentations that the Group's feedback would be public comment and the special treatment it gave the Group,[11] and (3) the disparate

---

[10] Adams: ER2664, ER2667-68; Kenoyer: ER2663-64.
[11] ER2666. Although not known at the time of pleading, for determining the plausibility of Parents' allegations, discovery on the Establishment Clause claim

treatment the Commission and State Board gave to suggested edits on the subject of Hinduism as compared with those relating to other religions.[12]

State Officials relied on the Group despite or because of their knowledge of the anti-Hindu history of its members, including Professor Jonathan Kenoyer, who was the principal contributor of the group. ER2379 ¶ 53. One egregious example is a textbook Kenoyer co-authored that the California Curriculum Commission was considering adopting for public schools in 2005. ER2378-79 ¶ 52. It rejected the text by a 14-0 vote because it "include[d] language and examples that [were] derogatory, accusatory, or instill[ed] prejudice against" Hinduism. ER2378 ¶ 53. The textbook mocked Hinduism, asking students, when discussing the Hindu epic Ramayana: "[t]he monkey king Hanuman loved Rama so much that it is said that he is present every time the Ramayana is told. So look around—see any monkeys?" *Id*.

Appellee Tom Adams, then Executive Director of the Instructional Quality Commission who communicated with members of the public about the use of experts, including that all comments from experts would be treated as public

---

revealed that Adams and another Department of Education official secretly solicited and coordinated the Group despite the Commission's contention that the Group's submissions were "public comment." ER0060-62. Also not known at the time of the initial pleading, the Commission accepted comments from the Group past the deadline for public comment. ER1016.
[12] ER2663-79.

comment rather than obtained by contracting with them under Department of Education regulation, had his own history of anti-Hindu sentiment, of which the other members of the Commission knew or should have known. ER2667-68 ¶¶ 69-71. That history includes involvement in the State Board's violation of the California Administrative Procedures Act in its consideration of content relating to Hinduism during the 2005-06 textbook adoption process and orchestrating a letter from a virulently anti-Hindu professor regarding revisions to demean Hindus in California textbooks, even though the professor had not read the revisions. *Id*.

All or virtually all of the Group's proposed edits relating to Hinduism reflected poorly on that religion. ER2664. The District Court tried to minimize the significance of the State Board's reliance on the Group by pointing out that the Board did not adopt the majority of the Group's anti-Hindu suggestions, but that observation misses the point that the State Board should not be consulting with a group that is anti-Hindu in the first place. Parents detailed the numerous changes the Group recommended that were hostile to Hinduism to make the point that School Officials were consulting with biased faculty. ER2664-65; ER2671. They never claimed that the State Board adopted all or most of the suggestions – just that several accepted were denigrating to Hindus and the rest evinced the Group's bias and that relying on the Group was *one* manner the process discriminated against Hindus. ER2663 ¶ 48 ("One significant manner in which the Framework adoption

process discriminated against Hindus was through the Commission's reliance upon anti-Hindu reports") *id*. ¶ 52 ("as set forth below, the South Asia Faculty Group report is patently anti-Hindu and should have been rejected by the Commission on that basis alone").

The District Court also distinguished *CAPEEM v. Noonan* on grounds that are more alike than distinguishable. The court noted that in *Noonan*, State Board members "fully vetted Dr. Bajpai, [an expert] who supported [Hindu groups'] edits, but they did not do the same for the experts they hired who opposed the edits, and defendants imposed special requirements only on Dr. Bajpai and not on the experts opposing the edits." ER0055. The court found that in "the present case, there are no such allegations, just content challenges masquerading as process challenges." *Id*. However, Parents alleged clearly that "the Commission did not rely comparably on the report of an outside faculty group for any content area other than Hinduism and Ancient India" and that the Commission rejected the recommendations of a group of scholars calling themselves the Social Sciences and Religion Faculty Group ("SSRF") who sent a letter objecting to the discriminatory treatment of Hinduism. ER2663 ¶ 51 (no outside faculty group for content area other than Hinduism); ER2671-72 ¶ 84 (rejection of SSRF recommendations).

The District Court's analysis of Parents' allegations of the exalted treatment the State Board gave to the Group was incomplete and drew inferences against

Parents. When examining the allegation that "[u]pon information and belief, the [State Board] went to elaborate lengths to hide its consultations with secret experts only with respect to Hinduism and did not do so for its depiction of other religions," the court found that:

> This conclusory statement is supported only by allegations that one of the Defendants "evaded questions" from Hindu parents about the expert hiring process. . . . Plaintiffs do not plausibly plead that the SAFG was ever given special expert status or deference. They merely note that a member of the Framework drafting commission suggested "defer[ring] to the scholars," including SAFG and its suggested edits.

ER0053. Parents' allegations that the State Board consulted secretly with and gave special treatment to the Group were far more serious than "evaded questions" and "deferring to the scholars." Moreover, the Parents' allegations of secret consultations and special treatment were plausible even before evidence revealed during discovery showed exactly those things. ER0060-62 (Visweswaran emails); ER1016 (Group comments accepted after deadline).

Notably, Parents' allegations of secret consultations and exalted treatment were far more detailed and serious than the District Court acknowledged:

- State Official Adams gave misleading and conflicting answers to questions about the Commission's use of experts on Hinduism, citing examples that suggested he was not truthful (ER2666-67);

- The Commission had available a Department of Education regulatory process to retain experts that would have provided transparency and accountability

but it chose not to use it (ER2663), which raises a fair inference that members wanted to avoid the transparency and accountability that would reveal their bias;

- Commissioner McTygue announced at a meeting that she had "had an extensive team of scholars and writers prepare drafts of the Framework," but neither she nor the Commission revealed who they were (ER2666), indicating secret consultations with experts;

- At another meeting, McTygue referred several times to unnamed scholars the Commission consulted, some from what she called "my network" (*id.*), also constituting secret consultations with experts;

- Commissioner McTygue made repeated endorsements of the Group's recommendations without understanding them, which can be described fairly as "exalted treatment (ER2669);"

- The Commission did not rely comparably on the report of an outside faculty group for any content area other than Hinduism and Ancient India (ER2663 ¶ 51).

The District Court concluded that Parents' allegations of disparate treatment during the Framework adoption were "implausible" and "strain[ed] credulity." ER0053. In reaching this determination, the court drew inferences from Parents' allegations against them and ignored other allegations. At the pleading stage, the law requires the opposite: the District Court must "accept the plaintiffs' allegations

as true and construe them in the light most favorable to plaintiffs" and cannot dismiss the complaint unless it "fails to state a claim to relief that is plausible on its face." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (internal quotes and citations omitted). Even if the District Court believed that the chance of Parents prevailing was "very remote and unlikely," that is not the correct test for dismissal. *Swierkiewicz*, 534 U.S. at 515.

Parents demonstrated that the insider perspective was accepted as edits for other religions while similar edits for Hinduism were rejected. ER2669-70. When a Christian group, Gateways to Better Education, requested the change from Jesus promising "eternal salvation to believers," to Jesus adding "the promise of eternal salvation to those who believe in him as their Savior," the request was granted without any scrutiny from experts. ER2669. A proposed change by Appellant CAPEEM to provide the believer's perspective and make the depiction of Hinduism more consistent with the depictions of Christianity and Islam by using the words "According to Hindu tradition, *rishis* or sages received revelations, which were composed and known as the Vedas" was rejected. ER2673-74 ¶¶ 87-89.

Parents also pointed out that the sensitivity shown toward Islam and Judaism was not shown toward Hinduism. When Muslims sought the removal of language that blamed Muslims of forced conversions, the request was granted and a

Commissioner justified that the change would make the language acceptable with respect to Islam. ER2673 ¶ 86. When Jewish groups sought the deletion of the story of the Good Samaritan on the grounds that it violated Category 1.10 of the Criteria for Evaluating Instructional Materials: Kindergarten Through Grade Eight, which forbids the inclusion of derogatory language about a religion or the use of examples from sacred texts or other religious literature that are derogatory, accusatory, or instill prejudice against other religions or those who believe in other religions, that request too was granted. ER2670 ¶¶ 77-79. However, in complete contrast, the State Officials rejected the request to remove caste as a Hindu religious belief. ER2670-71 ¶ 80-82.

For the foregoing reasons, the District Court's dismissal of Parents' equal protection claim should be reversed.

### D. Parents Adequately Pled a Claim Under the Free Exercise Clause

The modern test for a free exercise violation hinges on showing that the challenged law is either not neutral with respect to religion or not generally applicable. *Am. Family Ass'n*, 277 F.3d at 1123 (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531-34 (1993)). Parents allege that the Standards and Framework are not neutral with respect to religion because they both treat Hinduism markedly different from other religions, as described above. *Supra*, at 24-31. Further, Parents allege that because the substance of the Standards

and Framework are compulsory, their children learn and get tested in graded assignments on material that is not neutral on religion and conflicts with their fundamental religious beliefs.[13] ER2683 ¶ 129 (graded assignments); ER2681 ¶¶ 122-128 (district policies); ER ¶¶ 88-89, 95 (fundamental beliefs).

The District Court dismissed Parents' claim under the Free Exercise Clause based upon the fact that Parents did not "allege any specific religious conduct that was affected by the Defendants' actions." ER0043. It became clear from two Supreme Court decisions, however, that interference with religious conduct is not an element of a free exercise claim. The first case, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, (2017), was decided before the District Court ruled on State Officials' motion to dismiss the complaint. Parents filed a Statement of Recent Decision the day the opinion was issued. Dkt. 118. *Trinity Lutheran* involved a Missouri grant program that provided tire scraps to playgrounds to provide a safer surface for children than gravel, but did not allow grants to go to any applicant owned or controlled by a church. 137 S. Ct. at 2017. Trinity Lutheran Church challenged the program's policy that denied it a grant

---

[13] Requiring Hindu students to adopt State-mandated interpretations of their religion is a form of coercion that is itself an affront to the Establishment Clause. *Cf.* Lee v. Weisman, 505 U.S. 577 (1992) ("subtle coercive pressures exist and where the student had no real alternative which would have allowed her to avoid the fact or appearance of participation").

because it is a church. *Id*. The Court held that the program denying shredded tires to churches violated the Free Exercise Clause, expressly rejecting the State's argument that the program passed constitutional muster because "merely declining to extend funds to Trinity Lutheran does not prohibit the Church from engaging in any religious conduct or otherwise exercising its religious rights." *Id*. at 2022. The Court held that the State's refusal to provide tire scraps to the church violated the Free Exercise Clause because it was a penalty on the church. The "Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Id*. (internal quotes and citations omitted). Thus, forcing Hindu students to study and get graded on depictions of Hinduism that are inaccurate and bigoted constitutes coercion or penalties on the free exercise of religion. ER2683 ¶ 129 (graded assignments).

A year later, the Supreme Court decided another major free-exercise case, *Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018).[14] The free exercise violation in *Masterpiece Cakeshop* was based upon the Colorado Civil Rights Commission' hostility toward the plaintiff's religious beliefs

---

[14] Although *Masterpiece Cakeshop* was decided after the District Court ruled on State Officials' motion to dismiss, Parents' moved to amend their Complaint based in part on that case, which the court denied. ER1105-06; *see, infra*, at 45 (abuse of discretion to deny motion to amend).

and failure to adhere to the Free Exercise Clause's requirement of neutrality toward religion. The Court held:

> The official expressions of hostility to religion in some of the commissioners' comments—comments that were not disavowed at the Commission or by the State at any point in the proceedings that led to affirmance of the order—were inconsistent with what the Free Exercise Clause requires. The Commission's disparate consideration of Phillips' case compared to the cases of the other bakers suggests the same. For these reasons, the order must be set aside.

138 S. Ct. at 1732. The decision was based purely on "the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion," not any concept of a substantial burden on free exercise of religion. *See id*. Thus, the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id*. at 1731. "The Free Exercise Clause bars even subtle departures from neutrality on matters of religion." *Id*. (citation and internal quotes omitted). Neither *Trinity Lutheran* nor *Masterpiece Cakeshop* rely on any "substantial burden" to a religious practice.

Almost the entirety of Parents' Complaint is an account of the ways in which the Standards, Framework, and government officials are hostile to Hinduism and not neutral in how they describe the origins, beliefs, and contributions of different religions. State Officials simply cannot deny Hindus' belief in the divine origin of their faith while explaining the divine origins understood by observers of other

34

faiths,[15] use the offensive term "Brahminism" to define the "beliefs and practices"
that "evolved into Hinduism,"[16] describe Hindu scripture as "literature" that is part
of "important aesthetic and intellectual traditions" of India,[17] and ascribe caste as a
Hindu religious belief[18] without running afoul of the Free Exercise Clause
prohibition against hostility toward religion and requirement of neutrality.

The District Court's dismissal of Parents' free exercise claim should,
therefore, be reversed.

### E. Parents Adequately Pled a Claim of Unconstitutional Endorsement of the Abrahamic Faiths Under the Establishment Clause

The Supreme Court has made clear that:

> While study of religions and of the Bible from a literary and historic
> viewpoint, presented objectively as part of a secular program of
> education, need not collide with the First Amendment's prohibition,
> *the State may not adopt programs or practices in its public schools or
> colleges which 'aid or oppose' any religion.* This prohibition is
> absolute.

*Epperson*, 393 U.S. at 106 (internal citation omitted) (emphasis added). By
teaching biblical stories as actual history, the Standards and Framework endorse
the Abrahamic faiths in violation of the Establishment Clause.

---

[15] ER2655, ER2660-61, ER2673-75.
[16] ER2661.
[17] ER2660-61.
[18] ER2671.

The Standards require students to "[e]xplain the significance of Abraham, Moses, Naomi, Ruth, David, and Yohanan ben Zaccai in the development of the Jewish religion." ER2661 ¶ 41. If such people existed at all, there is no meaningful historical basis upon which to instruct students that they contributed to the development of Judaism. *Id*. The Standards also require students to "[d]iscuss the locations of the settlements and movements of Hebrew peoples, including the Exodus[19] and their movement to and from Egypt, and outline the significance of the Exodus to the Jewish and other people." *Id*. This requirement teaches religious stories as history without any meaningful historical basis. *Id*.

Similarly, the Framework portrays the Exodus from Egypt has an historical event – one that was "of great significance to Jewish law and belief, especially the concept of a special relationship or covenant between the Israelites and God." ER2677 ¶ 106. The Framework even assigns dates to Exodus and the characters from the Old Testament, ensuring they are considered actual history. ER2660 ¶ 33, ER2661-62 ¶ 42, ER2678 ¶ 107. In fact, historians do not consider the Exodus an historical event. *Id*. The Framework also embraces other Jewish religious doctrine as actual history and assigns dates to such doctrine. ER ER2677-78 ¶¶ 105, 107.

---

[19] Exodus refers to Moses leading his followers out of Egypt through a parting of the Red Sea.

Christian religious doctrine, too, is depicted in the Framework as though it were history:

> Through selections from Biblical literature, students will learn about those teachings of Jesus that advocate compassion, justice, and love for others. He taught that God loved all his creation, regardless of status or circumstance, and that humans should reflect that love in relations with one another. Jesus shared the Jewish belief in one God, but he added the promise of eternal salvation to those who believe in him as their savior.

ER2678 ¶ 108. In addition, the Framework teaches that Mary was the mother of Jesus as though it were historical fact. *Id*. ¶ 109.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The amendment is applicable to the States through the Fourteenth Amendment. *Cantwell v. Conn*., 310 U.S. 296, 303 (1940). The Supreme Court has explained that the "touchstone" of Establishment Clause jurisprudence is the requirement of "governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) (quoting *Epperson*, 393 U.S. at 104)). The clause applies not only to official condonement of a particular religion or religious belief, but also to official disapproval or hostility towards a religion. *Am. Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1120-21 (9th Cir. 2002).

In *Lemon v. Kurtzman*, 403 U.S. 602 (1971),[20] the Supreme Court established the test for analyzing government conduct under the Establishment Clause. To survive the test, the government conduct at issue must (1) have a secular purpose, (2) not have as its principal or primary effect advancing or inhibiting religion and (3) not foster an excessive government entanglement with religion. *Am. Family Ass'n*, 277 F.3d at 1121 (internal citations omitted). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

By requiring the teaching of biblical stories as history when there is no independent historical basis, the Standards and Framework endorse the Abrahamic faiths that are grounded in those stories. There can be no secular purpose to teaching ahistorical events from scripture as history, which violates the first prong of Lemon. *See Stone v. Graham*, 449 U.S. 39, 41 (1980) ("preeminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature"); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir. 1994) (discussion of "secular purpose" prong of Lemon test).

---

[20] The Supreme Court's decision last term in *American Legion v. American Humanist Association*, 139 S. Ct. 2067 (2019), made clear that four justices do not believe the *Lemon* test is apt for religious display cases. *Id*. at 2081-82. There is no indication, however, that the Court overruled *Lemon* in a school curriculum case or otherwise.

To determine the effect of the policy under the second prong, courts ask whether "it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion." *Vernon*, 27 F.3d at 1398. This inquiry is conducted "from the perspective of a reasonable observer who is both informed and reasonable," *Am. Family Ass'n*, 277 F.3d at 1122 (internal quotes and citation omitted). Any reasonable observer would understand that State Officials endorse ahistorical religious doctrine that they require to be taught as history. Further, such endorsement sends the "stigmatic message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members." *Trunk v. City of San Diego*, 629 F.3d 1099, 1109 (9th Cir. 2011) (citing *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–10 (2000) (internal quotes omitted)); *see Doe v. Porter*, 188 F. Supp. 2d 904, 911 (E.D. Tenn. 2002), *aff'd*, 370 F.3d 558 (6th Cir. 2004) ("the government, through its public school system, may not teach, or allow the teaching of a distinct religious viewpoint").

The District Court ruled that Parents' claim that the Standards and Framework teach biblical stories as history was implausible. ER0045. The court cited *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) for the proposition that "the court need not accept as true allegations contradicted by judicially

noticeable facts," but did not specify what facts it was judicially noticing. *See id*. Thus, it is not clear on what purportedly judicially noticeable facts the court based its ruling.

We do know that the court did not squarely address what Parents alleged are ahistorical stories. For example, Parents' alleged that the Standards portray Jews' Exodus from Egypt has an historical event – one that was "of great significance to Jewish law and belief, especially the concept of a special relationship or covenant between the Israelites and God." ER2677. This was a paraphrase of the Standard: "Discuss the locations of the settlements and movements of Hebrew peoples, including the Exodus and their movement to and from Egypt, and outline the significance of the Exodus to the Jewish and other people." ER1381. The District Court reasoned that: "The curriculum does not teach the parting of the Red Sea as fact. Rather, it acknowledges the "movement [of Hebrew peoples] to and from Egypt," and notes the "significance to Jewish law and belief" of the Exodus story." ER0046.

First, Parents never alleged that the Framework contains wording which claims that the parting of the Red Sea was as fact. More importantly, requiring students to "[d]iscuss the locations of the settlements and movements of Hebrew peoples, including the Exodus and their movement to and from Egypt" is teaching them that the Exodus is historical fact. Parents should be permitted to challenge

such endorsement of the Old Testament at the pleading stage. The District Court also concluded that the Standards do not teach religious figures as historical figures when they provide: "Explain the significance of Abraham, Moses, Naomi, Ruth, David, and Yohanan ben Zaccai in the development of the Jewish religion." ER0046. That language sure does not specify that the figures are biblical and there is no historical basis to believe they existed, which would make students understand it as an endorsement of the biblical story. Finally, in response to Parents' allegation that the Framework teaches that Mary was the mother of Jesus as though it were historical fact, the District Court points out that "the Framework makes no reference to the Christian belief in the immaculate conception." ER0046. That the State Officials did not commit a worse violation than what Parents alleged does not cure the allegation that the Framework teaches that Mary was the mother of Jesus without any historical basis.

Accordingly, Parents have more than adequately pled a violation of the first and second prongs of the *Lemon* test, since there is no secular purpose to teaching biblical stories as history and a reasonable observer would understand such teaching to be an endorsement of the sacred texts from which those stories are told.

### F. Parents Adequately Pled a Claim Under the Substantive Due Process Clause

Parents' Complaint alleges that the SBE requires the teaching of an inaccurate, offensive portrayal of Hinduism in the many ways described above.

41

That portrayal includes the teaching of the Aryan Invasion Theory, a discredited theory of Aryans invading or migrating to South Asia to "civilize" the subcontinent. ER2675 ¶ 96. It also includes the requirements that students "Explain the major beliefs and practices of Brahmanism in India and how they evolved into early Hinduism," even though the "term "Brahmanism" is offensive to Hindus and has been used historically to insult them, as the term signifies Hinduism as the religion of Aryan priests who were from the brahmin caste." ER2661 ¶ 38.

The Substantive Due Process Clause of the Fourteenth Amendment "protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637 (1943). "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality) (citations omitted).

One bookend for the law on substantive due process is a series of Supreme Court cases that make clear the clause applies to parents and the schooling of their children. *Meyer v. Neb.*, 262 U.S. 390 (1923); *Pierce v. Society of the Sisters*, 268 U.S. 510 (1925); *Wisc. v. Yoder*, 406 U.S. 205 (1972). The other bookend is this Court's opinion in *Fields v. Palmdale School Dist.*, 427 F.3d 1197 (9th Cir. 2005), *as amended*, 447 F.3d 1187 (2006). The public-school parents in *Fields* objected to

a survey provided to students that contained questions about sex. 427 F.3d at 1202. The panel held that the survey did not violate the Substantive Due Process Clause. 447 F.3d at 1190. The Court's holding was based in part on the fact that "before the survey was conducted the parents were notified and their consent was sought," yet "none objected and all but one signed and returned the consent form." 447 F.3d at 1191. Further, the Court's narrow reading of its own holding was that it "holds simply, as other courts have held, that parents of public school children are not possessed of a constitutional right, either under the Substantive Due Process Clause or the related right to privacy, to restrict the public schools from providing information on the subject of sex." *Id*. at 1190.

The *Fields* panel used broader language when it seemed to distinguish the Supreme Court's holding in *Meyer*, the case that found unconstitutional a prohibition against the flow of information into schools through the teaching of foreign languages: "we affirm that the *Meyer–Pierce* due process right of parents to make decisions regarding their children's education does not entitle individual parents to enjoin school boards from providing information the boards determine to be appropriate in connection with the performance of their educational functions, or to collect monetary damages based on the information the schools provide." *Id*. at 1191. Although that language appears to eliminate a substantive due process right to ever challenge the content of what public schools teach, it is submitted that

the language from *Fields* the Court repeated this year strikes an appropriate balance: "once parents determine their child's educational forum," i.e., they choose public school over private school, "their fundamental right to control the education is "substantially diminished."" *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 711 (9th Cir. 2019) (quoting *Fields*, 427 F.3d at 1206).

The "substantially diminished" language gives great deference to school boards, but ensures that "[w]hen the parental interest asserted is fundamentally central to the parent-child relationship, the public school must not be given a free pass." Davis, Elliot M., *Unjustly Usurping the Parental Right:* Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005)*, 29 Harv. J.L. & Pub. Pol'y 1133, 1134 (2006). When the State of California requires the teaching of inaccurate, religiously bigoted material, the Due Process Clause should be read to include the liberty and dignity interests of Hindu students and parents in this case to ensure that Hindus are treated fairly by the curriculum of the California public school system. "The [Supreme] Court has long used the Due Process Clauses to further equality concerns, such as those relating to . . . religious minorities." Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 749-50 (2011) (citing *Pierce*, 268 U.S. at 534 (using due process liberty analysis to protect religious minorities); *Loving v. Va.*, 388 U.S. 1, 12 (1967) (using due process liberty and equal protection analyses to protect racial minorities); *Buchanan v. Warley*, 245

U.S. 60, 82 (1917) (using due process liberty analysis to protect racial minorities)). The hybrid due process-equal protection interest Professor Yoshino describes applies to Parents' claims here. *Id*. at 779 (citing *Lawrence v. Texas*, 539 U.S. 558, 575 (2003)); *see* ER2672-74 (Parents' dignity interest).

Accordingly, the District Court's order dismissing Parents' substantive due process clause should be reversed.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING PARENTS' MOTION TO AMEND COMPLAINT

### A. Standard of Review

The standard of review for a district court's denial of a motion to amend complaint under Federal Rule of Civil Procedure 15(a) is abuse of discretion. *Gordon v. City of Oakland*, 627 F.3d 1092, 1094 (9th Cir. 2010).

### B. District Court's Denial of Motion to Amend Complaint

"The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This leave policy is applied with "extreme liberality." *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Parents moved to amend their complaint to add facts and account for two Supreme Court decisions on free-exercise law. ER1433-41. The entirety of the District Court's denial of Parents' motion to amend was:

> The Court hereby DENIES Plaintiff's Motion to Amend Complaint. *See* Mot. to Amend (dkt. 172). The Court rejects Plaintiffs' arguments about the new factual allegations and rejects Plaintiffs' interpretation

of *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018). *See id*. at 4-7. Accordingly, amendment would be futile. *See Leadsinger, Inc. v. BMG Music Pub*., 512 F.3d 522, 532 (9th Cir. 2008).

ER1105.

### C. Amendment Based Upon New Facts and Law Would Not Be Futile

In assessing futility, which the District Court cited as the sole basis for denying the motion to amend, the court applies the same standard governing Rule 12(b)(6) motions to dismiss: i.e., a proposed amendment is futile if it does not plead enough to make out a plausible claim for relief. Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial, Amended and Supplemental Pleadings, Ch. 8-F (internal quotes and citations omitted). It is clear that Parents' proposed amended complaint made out a plausible claim for relief under the Free Exercise Clause. ER2728-ER2770.

After the District Court denied State Officials' motion to dismiss Parents' claim that the Standards and Framework are derogatory toward Hinduism under the Establishment Clause, Parents obtained new information through discovery and otherwise. ER1434-36. The new facts in the proposed Amended Complaint added approximately nine pages of allegations. Parents' had obtained email communications among faculty members of the Group indicating that State Official Adams solicited certain faculty to provide comment on the Framework and

that he and another member of the Department of Education coordinated the Group's efforts. ER2740. Parents also learned from a later-published version of the Framework that two members of the Group, Professors Robert Goldman and Sudipta Sen, were associated with the California History-Social Science Project CHSSP, the "primary writer" for the Framework, and as contributors of material. ER2740. This later version was not available to the public at the time of dismissal of the free exercise claim. ER2773.

Thus, School Officials were touting the "public comment" of the Group, while, in fact, Adams solicited and coordinated faculty to get the anti-Hindu perspective he wanted, and two members of the Group had an official role in writing the Framework. Many communications among members of the Group were openly hostile to Hinduism, yet none expressed disapproval of the anti-Hindu sentiments expressed, not even Professors Goldman and Sen, who were affiliated with the statutorily sanctioned CHSSP.

Some of the most important new allegations in the proposed Amended Complaint included:

> 65.    The adopted Framework lists two members of the SAFG, Professors Robert Goldman and Sudipta Sen, as associated with the CHSSP, the "primary writer" for the Framework, and as contributors of material. The CHSSP has a statutory role in the development of the

curriculum pursuant to the sections of the Education Code cited above. The participation of two members of the SAFG in the writing of the Framework emphasizes the intertwined role the SAFG had in creating the Framework, making it a quasi-governmental entity.

66.     Tom Adams, then Executive Director of the Commission, solicited the SAFG professors. Adams' purpose in selecting certain professors was to obtain the anti-Hindu perspective he knew they would provide. He knew to select those professors because he had worked with them before to incorporate anti-Hindu views into the California public school curriculum. In particular, Adams had worked on CHSSP with professors who were part of SAFG and knew that other professors had previously worked with Witzel and him in 2005 to disparage Hinduism. In fact, after requesting the letter from Witzel in 2005, Adams also used the input he solicited as justification to inject anti-Hindu points into textbooks.

67.     In October 2015, Adams asked the SAFG for a "short, concise report" with a specific deadline. His main contact with the group was Kamala Visweswaran, a professor at the University of California at San Diego. When communicating with other professors about Adams' instructions for their report, Visweswaran made

references to Plaintiff CAPEEM and another Hindu organization as "Hindutva front organizations" and "Hindu nationalist organizations," which she used as religious slurs without any basis in fact. Indeed, any view with which she disagrees is the "Hindu nationalist view."

68.     Visweswaran coordinated with other professors in the SAFG, including Jonathan Kenoyer, to submit reports to the Commission, the History Social Science Subject Matter Committee, and the SBE.

69.     Kenoyer and several other people whose names appear on the SAFG reports had also signed onto the anti-Hindu letter from Professor Michael Witzel to the SBE in 2005 that had been solicited by Defendant Adams.

ER2740-41.

In addition to the new facts Parents included in their proposed Amended Complaint, they based their motion on the Supreme Court's decisions in *Trinity Lutheran Church* and *Masterpiece Cakeshop*, which changed the law on the Free Exercise Clause, as discussed above. "It is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile." *See Doe v. Nestle U.S., Inc.*, 766 F.3d 1013, 1028 (9th Cir. 2014) (citations omitted).

In sum, Parents' proposed Amended Complaint alleged ample facts to show a lack of neutrality toward Hinduism and expressions of hostility toward Hinduism to support a free exercise claim under the *Trinity Lutheran Church* and *Masterpiece Cakeshop* cases.

### D. Amendment Would Not Prejudice State Officials

This Court has held that it is the consideration of prejudice to the opposing party that carries the greatest weight on a motion to amend complaint. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The District Court did not mention any prejudice to State Officials as a basis for denying Parents' motion and the only prejudice State Officials cited in their opposition to the motion was that of litigating the free exercise claim.[21] As a general rule, additional expense and discovery is insufficiently prejudicial to deny a proposed amended complaint when the new facts came to light after the prior complaint was filed. *See, e.g., Genentech, Inc. v. Abbott Laboratories*, 127 F.R.D. 529, 531 (N.D. Cal. 1989).

Accordingly, the District Court's order denying Parents' motion to amend their complaint should be reversed.

───────────────────

[21] In addition to prejudice and futility, the other basis upon which a court can deny a motion to amend complaint is bad faith on the part of the movant. State Officials did not make a meaningful argument that Parents' motion was in bad faith.

## III.   SUMMARY JUDGMENT IN FAVOR OF STATE OFFICIALS SHOULD BE REVERSED

### A. Standard of Review

The Court reviews de novo a district court's order granting summary judgment. *Edgerly v. City & Cty. of S.F.*, 599 F.3d 946, 953, 960 (9th Cir. 2010). It reviews the admission of expert testimony for an abuse of discretion. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010).

### B. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). State Officials, as the moving parties, bear the initial burden of demonstrating the absence of a material issue of fact. "[A] party seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).

Viewing the facts and drawing reasonable inferences in the light most favorable to Parents, a reasonable observer could conclude that the Standards and Framework are derogatory toward Hinduism and, therefore, violate the second prong of the *Lemon* test. That is, to deny State Officials' Motion for Summary Judgment, the Court need only find that "it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1398 (9th Cir. 1994) (citations omitted).

### C. Summary Judgment in Favor of State Officials Should Be Reversed Because Genuine Issues of Material Fact Preclude Judgment as a Matter of Law

Although it is "perhaps most frequently used in cases involving government allegedly giving preference to a religion, the *Lemon* test accommodates the analysis of a claim brought under a hostility to religion theory as well." *Am. Family Ass'n*, 277 F.3d at 1121 (citing *Vernon*, 27 F.3d at 1396). The denigration of Hinduism in both the Standards and Framework violates the second prong of *Lemon*, since "it would be objectively reasonable for the government action to be construed as sending primarily a message of . . . disapproval of religion." *Vernon*, 27 F.3d at 1398. Further, the court gives "heightened" scrutiny to any possible religious disapproval by elementary school curricula. *See Brown v. Woodland Joint*

*Unified Sch. Dist.*, 27 F.3d 1373, 1379 n.4 (9th Cir 1994) (citing *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 686, 689 n.9 (7th Cir.1994)).

The District Court erred in concluding that, as a matter of law, a reasonable observer would conclude that the Standards and Framework do not denigrate Hinduism. This error stems from two things: first, the court ignores much of the evidence that derides Hinduism and, second, the court draws inferences on the evidence in favor of the State Officials instead of nonmovant Parents.

The District Court simply ignored the following facts that are derogatory to Hinduism:

- The theory that Aryans invaded Ancient India which the Standards portray as fact is racist and debunked. ER1474 ("Explain the major beliefs and practices of Brahmanism in India and how they evolved into early Hinduism."); *id*. ("Discuss the significance of the Aryan invasions."); ER0633 (Joshi Report).

- The Standards' reference to the beliefs and practices of "Brahmanism" evolving into early Hinduism is a derogatory reference to Hinduism. ER1474; ER0639; William Safire, *Safire's Political Dictionary* 78 (2008) ("Brahminism is the word for the often-attacked but never really removed caste system in [India].")

- The *Bhagavad Gita* and the Vedas are sacred scripture according to Hindus, which is not acknowledged in the Standards or Framework as are the holy books of other faiths. ER0639.

- The Standards Commission knew the language that something "evolved into" a religion was derogatory as it had responded to objections and changed it for monotheistic faiths, but the State Board used it for Hinduism. ER1474; ER0870.

- The Standards Commission knew that "None of the recent scholarship on Ancient India supports the idea that an "Aryan invasion" ever occurred. [There is] absolutely no evidence of it," but included the Aryan invasion theory in the Standards anyway. ER065.

- The Standards present the Bhagavad Gita as an example of literature that is part of intellectual and aesthetic tradition, but do not mention that Hindus consider it sacred scripture. ER1474.

- State Officials removed a reference to the Samaritans in a draft of the Framework at the request of a Jewish group that claimed it was derogatory to Judaism and violated Category 1.10. ER0609.

- State Officials changed the description of Jesus's "salvation through love" to "the promise of eternal salvation to those who believe in him as their savior" to make it consistent with the believer's version of the faith at the request

of the Christian group Gateways to Better Education. ER0846-47; ER1713. The rationale given by Gateways was: "We know of no Catholic or Protestant doctrine that asserts that Jesus taught "salvation through love." According to John 3:3, Jesus said "Most assuredly I say to you, unless one is born again, he cannot see the kingdom of God." In Matthew 7:21 Jesus said, "Not everyone who says to me, 'Lord, Lord!' will enter the kingdom of heaven, but only the one who does the will of my Father in heaven."" ER0064-65.

- The Framework uses the term "Indo-European" which is a synonym for "Aryan." ER0650.

- The Framework presents Vedas as human creation, and Ramayana as a story, but Qu'ran as a description of Muslim belief that it is based on revelations. ER1687 (Ramayana as a story); ER1720 ("Muhammad, an Arabic-speaking merchant, received revelations from God.").

- The Framework refers to Ramayana as a story and adventure but Exodus as an historical event. ER1687 (Ramayana as a story); ER2228 ("[d]iscuss the locations of the settlements and movements of Hebrew peoples, including the Exodus and their movement to and from Egypt").

- The Framework does not present the Exodus, New Testament or the Quran as stories and adventures or literature.

- State Officials rejected public comment to the Framework that sought to present Vedas as revelations received by rishis or sages. ER1054.

- The Framework presents caste as a religious belief. ER1689. An earlier draft of the Framework stated that caste was not a religious belief but it was changed at the behest of the Group orchestrated by Adams. ER1016

- State Officials rejected the input during the Framework process to link slavery with Christianity. ER0817.

- State Officials rejected the input during the Framework that women were not allowed as priests in the Catholic church. ER0848.

- For a public hearing on the Framework draft, State Officials set a deadline of February 29, 2016 for input to be considered by the History-Social Science Subject Matter Committee meeting on March 24, 2016. ER1020. State Officials gave special consideration to the South Asia Faculty Group solicited by California Department of Education officials by considering the group's submissions made on the morning of March 24, 2016. ER1016 ¶ 15.

- The court completely ignored Parents' evidence that a member of the Group who was not an historian was literally making up historical narratives to fit her and Adams' anti-Hindu agenda: "I wonder if it can be suggested that the period 300-1200 in South Asia can be framed as that of religious evolution and mixture all around in which Hinduism, Buddhism, and Islam play significant parts at

various points in time based on geographical region and the political situation within India. That would disassociate Islam from being political regime first and religion later, and, inversely, highlight the historicity and political contexts of the Hindu-Buddhism developments as well. We are not clear whether this can or cannot be accomplished in the context of the existing narrative." ER0062.

- Two members of Group, Sudipta Sen and Robert Goldman, were also contributors to the Framework. ER0820; ER1522.

The District Court also impermissibly drew inferences in favor of State Officials who moved for summary judgment, several of which are described above regarding the court's characterization of Adams' "evading questions" and McTygue "deferring" to the Group. *See, supra* at 28-29. The court drew many more inferences against Parents:

The District Court used sleight of hand to try to compensate for the Framework's upending Hindus' belief in the divine origins of their faith. The Framework assigns secular origins to so-called divine principles. Thus, "Ancient Hindu sages (brahmins and others) *expounded the idea* of the oneness of all living things and of Brahman as the divine principle of being." ER1687 (emphasis added). The court embellishes the Framework to reject Parents' argument by using the religious descriptor "revealed" in place of the secular "expounded" when

defending it: "The Framework states that "Ancient Hindu sages" *revealed* the concept "of Brahman as the divine principle of being."" ER0016 (emphasis added).

The Framework also secularizes Hinduism by ascribing human origins to religious rituals rather than describing Hindus' belief in their divine roots. Thus, "*Brahmins*, that is, priestly families, assumed authority over complex devotional rituals." ER1687. The District Court suggested that Parents would prefer language that "According to Hindu tradition" as though the problem were the absence of those exact words. ER0016. To be clear, the problem is that Hinduism is not based on human sages as "the originators of ideas," but of sages as the recipients of revelations.

Among the professors recruited to the Group to provide reports to the State Board were Sudipta Sen and Robert Goldman. ER0285. Sen and Goldman were also associated with the CHSSP and contributed material in that official capacity as authors of the Framework. ER0820; ER1522. Their dual roles in writing the Framework and providing reports on its drafts through the Group recruited by Adams was not revealed until the December 2017 version of the Framework was published, which, for the first time, included "Acknowledgments." ER1522. Sen also provided what was purported to be public comment at a History-Social Science Subject Matter Committee Meeting. ER0304.

The District Court noted that "The Court is no authority on ancient Indian history and in no position to declare one version true and the other false." ER0022-23. The court's reference is to Parents' objection to the Standards requiring the teaching of the Aryan Invasion Theory, a discredited racist theory relating to the origins of Hinduism. *See, supra*, n.4. Parents cited the works of several members of the Group acknowledging this. *Id*. Indeed, no modern scholar would defend the Aryan Invasion Theory. Parents' objection is that a discredited, racist theory is taught as the origins of Hinduism. Instead of acknowledging the troubling fact that the Standards require the teaching of the Aryan Invasion Theory, the court conflated with other theories about migration and language which have nothing to do with the belief in the divine origin of Hinduism, then professed an inability to choose between competing theories – which Parents never asked the court to do.

An email communication from a professor being directed by Adams indicated a goal of creating the Framework to "preclude" proposals from the Hindu American Foundation and other Hindu groups from "having any traction," even though that would "create a bit of a smoke and mirrors situation." ER 231-2 224. The District Court gave an overly generous reading to the professor's plotting, as "simply stated that the group was not going to respond directly to a particular Hindu organization (Hindu American Foundation)," even though the reference was, in fact, to "HAF or other proposals." ER0027.

Accordingly, the District Court's conclusion that a reasonable observer would not, as a matter of law, understand that the Standards and Framework are derogatory toward Hinduism cannot be sound when the court ignored much of the most compelling evidence of derogatory treatment and improperly viewed other evidence in a light most favorable to State Officials.

### D. Exclusion of Expert Report Was Abuse of Discretion

This case is fundamentally a dispute over the meaning of the Hinduism content of the Standards and Framework. The District Court noted that it is "no authority on ancient Indian history and in no position to declare one version true and the other false." ER0022-23. Part of ancient Indian history is the history of Hinduism and the court could not adequately perform the Establishment Clause analysis based solely upon the text of the Standards and Framework. Under controlling law on the reasonable observer test under *Lemon*, precedents sensibly forbid an observer to turn a blind eye to the context in which the policy arose." *McCreary*, 545 U.S. at 866 (internal quotes and alteration omitted). To understand the offensiveness of the term Brahminism in the Standards, the significance of the *Bhagavad Gita* to the Hindu religious tradition and the significance of the Standards stripping it of its religious meaning, the Framework's assertion that "Vedic culture emerged as a belief system," and its reference to "Indic speakers" in connection with the racist and discredited Aryan Invasion Theory requires context

that the District Court did not have. *See McCreary*, 545 U.S. at 867 ("under the Establishment Clause detail is key").

Without the expert report submitted by Parents, the District Court had only the perspective of Standards and Framework – the very documents Parents challenge – to understand their representations of Hinduism. *Cf. City of Pomona v. SQM N.A. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("the district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury"). The court's self-imposed limitation was an abuse of discretion.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's (1) dismissal of Parents' equal protection, free exercise, due process, and the endorsement part of their establishment of religion claims, (2) order denying Parents' motion to amend their Complaint, and (3) summary judgment against Parents' Establishment Clause claim on the derogatory treatment of Hinduism by the Standards and Framework, so that Parents can prosecute the claims the court dismissed and go to trial on the derogatory-treatment-of-Hinduism claim.

Date:  August 8, 2019

KATON.LAW

*/s/ Glenn Katon*
Glenn Katon

Attorney for Appellants
CALIFORNIA PARENTS FOR THE
EQUALIZATION OF EDUCATIONAL
MATERIALS; ARVIND RAGHAVAN,
individually and as parent and next friend of
M.R. and N.R.; VISHNUKUMAR
THUMATI, individually and as parent and
next friend of P.T. and N.T.; SHAILESH
SHILWANT, individually and as parent and
next friend of P.S. and P.S.S.

# STATEMENT OF RELATED CASES

Appellants are not aware of any related cases pending in this Court.

Date: August 8, 2019

KATON.LAW

*/s/ Glenn Katon*
Glenn Katon

Attorney for Appellants
CALIFORNIA PARENTS FOR THE
EQUALIZATION OF EDUCATIONAL
MATERIALS; ARVIND RAGHAVAN,
individually and as parent and next friend of
M.R. and N.R.; VISHNUKUMAR
THUMATI, individually and as parent and
next friend of P.T. and N.T.; SHAILESH
SHILWANT, individually and as parent and
next friend of P.S. and P.S.S.

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,785 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Mac Version 16.26 Times New Roman 14-point font.


Date:  August 8, 2019

KATON.LAW

*/s/ Glenn Katon*
Glenn Katon

Attorney for Appellants
CALIFORNIA PARENTS FOR THE
EQUALIZATION OF EDUCATIONAL
MATERIALS; ARVIND RAGHAVAN,
individually and as parent and next friend of
M.R. and N.R.; VISHNUKUMAR
THUMATI, individually and as parent and
next friend of P.T. and N.T.; SHAILESH
SHILWANT, individually and as parent and
next friend of P.S. and P.S.S.

# CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  August 8, 2019

KATON.LAW

*/s/ Glenn Katon*
Glenn Katon

Attorney for Appellants
CALIFORNIA PARENTS FOR THE
EQUALIZATION OF EDUCATIONAL
MATERIALS; ARVIND RAGHAVAN,
individually and as parent and next friend of
M.R. and N.R.; VISHNUKUMAR
THUMATI, individually and as parent and
next friend of P.T. and N.T.; SHAILESH
SHILWANT, individually and as parent and
next friend of P.S. and P.S.S.